IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ANTHONY VINCENT CARTMAN,

    Defendant.

CRIMINAL CASE NO.

1:10-cr-512-01-JEC

## ORDER AND OPINION

Defendant was tried before a jury, convicted, and sentenced to 137 months in prison.  The facts of the case were fairly simple.  As found by the jury, defendant, along with his co-conspirator, Tchaka Shields, exploited two women with whom defendant was romantically involved, to make straw purchases of firearms in the Atlanta area. Defendant could not legitimately make these purchases, as he was a convicted felon, having previously been convicted of conspiracy to distribute crack cocaine and of being a felon in possession of a firearm.

The evidence indicated that defendant and his co-conspirator purchased these guns in order to sell them in the Boston area, which they did.  Based on this conduct, defendant was convicted of causing false representations as to the true purchaser of firearms to be recorded in a federal firearms transaction record, as well as being

a felon in possession of these firearms.  Defendants' three co-defendants pled guilty reasonably quickly after the filing of the indictment.  Defendant, however, remained a fugitive for eight months, and his proceedings began thereafter.

Since the beginning of the case, defendant has been a profligate filer of motions, even though he was appointed counsel.  This Order memorializes the Court's oral rulings on the last group of motions filed by defendant and its decisions on other matters.  It further explains the status of defendant's legal representation during the proceedings, and the conduct of defendant that unnecessarily protracted and  complicated the proceedings.

**I.   DEFENDANT'S LEGAL REPRESENTATION PRIOR TO AND DURING TRIAL**

A.   "Sovereign Citizenship" Phenomenon

In the Northern District of Georgia, a new practice has found its way into local jails where pretrial criminal defendants are being housed.  At these facilities, some of the inmates have been introduced to a relatively new tactic apparently believed to be useful in trying to avoid a criminal conviction, or at least muddy the waters: a declaration of the defendant's sovereign citizenship. At bottom, a sovereign citizen claims that a federal court has no jurisdiction to try the defendant for the federal crimes with which he is charged.  The sovereign citizen purports to rely heavily on the Uniform Commercial Code ("UCC"), admiralty laws, and other commercial

2

statutes to argue that, because he has made no contract with the Court, the Court can enforce no agreement upon him. The criminal code is apparently not one of the groups of statutes whose validity the defendant will acknowledge.

The sovereign citizen typically files lots of rambling, verbose motions and, in court proceedings, will often refuse to respond coherently to even the simplest question posed by the Court. Each question by the judge is volleyed back with a question as to what is the judge's claim and by what authority is the judge even asking a question. When referred to as the defendant or by his name, the defendant will frequently indicate that there is no proof that he is the defendant, but that instead he is a third-party intervenor.

In proceedings, the observant sovereign citizen clings doggedly to the sovereign citizen script, which the record excerpts in this case reveal to be tedious and mind-numbingly repetitious. The colloquy with the court is often characterized by frequent interruptions by the defendant, who attempts to talk over the judge. For the most part, the defendant's statements to the Court are gibberish. On the matter of legal representation, the defendant will often refuse to cooperate with, or even speak to, his appointed counsel and will sometimes protest that he never authorized appointment of counsel. Yet, when the Court attempts to engage the defendant to determine whether the latter wants new counsel or wants

3

to represent himself, the non-responsive dialogue begins, with the defendant refusing to affirmatively indicate his waiver of counsel or to answer in any coherent way how he wishes to proceed or in any way that suggests the defendant would be willing to comport himself at a trial in a manner that would allow a trial to even proceed.

Although there have been some moments in these proceedings after the trial began when this defendant has stepped out of his "sovereign citizen" persona to behave like an appropriately-functioning defendant, in the pretrial proceedings before this Court, he hewed largely to the above script.

B.   <u>Colloquies With Defendant Regarding Representation of Counsel</u>

After arraignment, defendant was appointed counsel. At the pretrial conference held shortly thereafter, appointed counsel raised uncertainty as to whether the defendant wanted to proceed *pro se*. In response, the magistrate judge set down a hearing on the matter. (Minute Entry, Sept. 7, 2011 [85].)

At this hearing, the defendant did respond directly to the question whether he wanted his appointed lawyer to continue representing him, answering that he did. (Sept. 21, 2011 Hr'g. [243] at 7-8.) The magistrate judge gave the defendant sound, practical advice about allowing his attorney to perform that role and discouraged the defendant, who had already filed many inapt motions,

4

from continuing to do so. (*Id.* at 9.)  The hearing concluded with appointed counsel continuing as counsel.  (*Id.* at 10.)  *See also* Minutes Entry, Sept. 21, 2011 [92].

Unfortunately, the magistrate judge's advice fell on deaf hears, and the defendant continued filing numerous motions, which protracted the pretrial process.  Shortly before the magistrate judge certified the case as ready for trial and before this Court set down a trial date, the magistrate judge convened another hearing with defendant and counsel, as a result of a letter [116] and a notice [119] she had received from defendant from which she inferred that defendant might want to have new counsel appointed.  (Feb. 23, 2012 Hr'g. [244] at 2.)

At the hearing, the defendant indicated his frustration that his counsel would not, himself, file the repetitious "sovereign citizen" motions that defendant kept urging him to file. (*Id.* at 3.)  Once again, the magistrate judge offered sound advice to the defendant that he should stop filing jurisdictional and other similar motions. Given defendant's professed concern about his speedy trial rights, the magistrate judge indicated that she would consider a Speedy Trial Act motion, should the defendant wish to file that. (*Id.* at 17.)  As to whether the defendant wished to continue with appointed counsel, defendant indicated that he did.  *Id.* at 13-14.

Shortly after this hearing, on March 22, 2012, the undersigned

5

set a trial date for May 21, 2013.  Two weeks before this trial date, defense counsel filed a Motion to Withdraw As Counsel [149], noting that while the defendant had never explicitly requested new counsel or to represent himself, he had refused all visits from counsel and had failed to respond to counsel's attempts to contact him by mail.

The Court hastily convened a hearing on the next day for the defendant and counsel.  The defendant began the proceedings by stating that he was a third-party intervenor who was relieving appointed counsel of his duties.  Before launching directly into this topic, the undersigned indicated that the Court would deal with other matters first, and attempted to discuss the arraignment of defendant on the recent superseding indictment.  (May 9, 2012 Hr'g. [245] at 23-26.)

The conversation between the Court and the defendant then quickly went south.  The defendant refused to enter a plea to the new indictment because, among other things he did not understand "the cause and nature" of the charges and his attorney was no longer his attorney and should not be able to speak.  When the Court indicated that it was directing counsel to speak, the defendant continued to interrupt and talk over the undersigned, questioning the undersigned's authority and again claiming that he was the third-party intervenor who had "a superior claim over Mr. Cartman." (*Id.* at 27-28.)

6

Following other substantive discussion with counsel about evidentiary matters, the Court then indicated that the defendant would have to decide whether he wanted to stipulate to the fact that he is a felon, or whether instead he wanted the Government to prove the fact of his prior felony convictions. In response, defendant answered that he was "here under Rule 24, a special appearance as the third-party intervenor on behalf of Anthony Vincent Cartman, and I still have questions that I would like to ask." (*Id.* at 35.) When the Court focused defendant again on whether he wanted to stipulate, he responded that he would do so only if the prosecutor "shows me some type of contract or claim or a claimant or tells me the injury, the loss, the damages that the defendant created with the United States." (*Id.*)

When told that the prosecutor would not be making that showing, defendant began again quizzing the Court about its lack of authority to keep such information from a third-party intervenor, such as himself. (*Id.*) The Court concluded this topic by telling the defendant that he could choose one of three answers to the question: either (1) "yes" that he would stipulate, (2) "no" that he would not stipulate, or (3) that he would like to think about it. Defendant refused to answer the question, again challenging the Court's authority. (May 9, 2012 Hr'g. [245] at 36.) After further attempts to get an answer, to which the defendant's response was always the

7

same looping questions back to the undersigned, together with claims not to understand "the cause and nature," the Court abandoned this line of questioning. (*Id.*)

The Court next asked the defendant whether he wanted to represent himself. Defendant likewise refused to respond directly to this question. Instead of a "yes" or "no" reply, the defendant answered, "If the prosecution can come up with a proper claim against the defendant that would be an option." The Court attempted to explain that the indictment was the claim, to which the defendant looped back to his claimed mystification as to whom the real party in interest was and the absence of "any damages, loss or trespass here." The Court's explanation that the "real party in interest" was the fellow who could be going to jail--him--apparently did not adequately clarify the matter, as defendant's repetitious questions continued. (*Id*. at 39-40.)

The undersigned then switched gears and attempted to explain to defendant how a trial would proceed and the rights he would enjoy as to a presumption of innocence, the Government's burden of proof, and the defendant's opportunity to put up a defense or to remain silent. (*Id*. at 40.) When asked if he understood the procedure, the defendant did not respond, but instead inquired whether the Court followed the Constitution or the criminal procedure rules or the civil procedure rules. The undersigned answered that she tried to follow all the

8

rules, but not the rules of civil procedure in a criminal case.  As defendant's fixation has always been on the applicability of civil rules to his case, this answer prompted his professed concern that the Court would not be following Rules 1 and 2 of the civil procedure rules, as well as the rules of "common law, equity, and admiralty. " (May 9, 2012 Hr'g. [245] at 41-42.)

When the Court noted that defendant had earlier agreed to be represented by his appointed counsel, he disagreed and launched again into his jurisdictional argument concerning admiralty, equity, and common law.  This prompted yet another effort by the Court to try to explain to the defendant the difference between a legal argument that he could make to the appellate court and the factual question of his guilt that a jury would resolve.   That effort, not unsurprisingly, prompted defendant to again ask the undersigned what the claim was, whether the Court was bound by Supreme Court decisions, and, again, whether the undersigned would be following civil or criminal rules of procedure.  (*Id*. at 44-46.)

The undersigned then tried to move to a new topic by asking the defendant some biographical questions about his background.  This went successfully for a few questions, until the defendant bored of the topic and again questioned the undersigned's authority to ask him these questions. (*Id*. at 48.)   The undersigned attempted to explain to defendant that the tactic he was using was not wise and that he

9

should focus seriously on his criminal charges, not on the irrelevant questions he was asking.  Again, the defendant protested that he had done no damages, theft, injury, nor caused any loss, and he professed, "I just don't understand."  (*Id*. at 49.)

The Court responded that if the defendant truly understood nothing, he would be in no position to represent himself, and asked the defendant to explain the elements of the offense.  Defendant's response was a citation to Rules 1 and 2 of the civil procedure rules, as well as "1938 common law," and laws of equity and admiralty that had been combined in 1968.  Introducing a new argument, he also noted that, per Rule 54 of the criminal rules of procedure, the criminal rules were only applicable in "Hawaii, Alaska, and so forth."  (May 9, 2012 Hr'g. at 51.) This latest thought prompted defendant to express uncertainty whether the undersigned was an Article III court or an Article I court charging him with Article IV violations.  Pursuing this jurisdictional line of attack, defendant opined that the crimes had to have happened in a special maritime jurisdiction and that he was not in the "federal corporation, United States.  I was not inside your jurisdiction."  (*Id.*)  Finally, defendant asked the prosecution for the "certificate of session for these locations." (*Id*. at 52.)

The Court then attempted to explain to defendant the elements of the offense, noting that the Government would have to prove that the

defendant possessed a firearm that had traveled in interstate commerce. When the undersigned asked if defendant understood the elements, he responded:

> Was I ever in possession with a firearm within the United States? I could be in Afghanistan. I can go to Mexico. I can go to Canada. I can go anywhere and possess a firearm except in the United States. I was not located within the United States....

(*Id.* at 52-53.)

The Court responded that the Government would attempt to prove that the defendant was in the Northern District of Georgia and other places during the conspiracy, which remark prompted the defendant to inquire whether the Northern District of Georgia had been ceded to the federal government and whether there was a "notice of acceptance letter" from the Governor confirming that fact. According to the defendant, it was "mandatory that they show these things."

The undersigned asked whether defendant had given any thought to what his defense might be, should he represent himself. The defendant responded:

> Well, would I need a defense if we had a claimant that was going to tell the truth...? You know, then I would need a defense. But right now we have a ghost over there that I don't; I can't see. I don't know what he is saying. He is not saying anything. He is saying a violation of a rule that's in a book that in Rule 54 says goes to a whole nother place and this is not it. I'm just trying to understand.

(*Id.* at 55.)

11

In response to the Court's question whether he understood that, if he was convicted, there would be a sentencing hearing and whether he understood how that worked, defendant indicated that he did not understand.  (*Id.* at 55.)   The Court's question as to the defendant's understanding of the evidentiary rules predictably elicited questions about which rule book the undersigned would be using.  (*Id.* at 56.)

Finally giving up on any likelihood of a responsive answer to any questions, the undersigned concluded that the defendant's responses indicated either an insufficient understanding of the proceedings or the lack of a genuine desire to represent himself at a criminal trial.  Given the lengthy, unsatisfying colloquy, the Court indicated that appointed counsel would continue to represent the defendant at trial.  (*Id.* at 56-58.)  When asked if he understood that he needed to work with his counsel, defendant answered, "I conditionally accept that, but I still need to know the claim." (*Id.* at 58.) He then continued to complain that he had not gotten answers to his questions. (*Id.* at 58-59.)

C.   <u>Discussion</u>

In its *en banc* opinion in *United States v. Garey*, 540 F.3d 1253, 1257(11th Cir. 2008)(en banc), the Eleventh Circuit acknowledged the principle, articulated in the Supreme Court's decision in *Faretta v.*

12

*California,*[1] that a criminal defendant may waive counsel as long as he does so intentionally and knowingly. The court noted, though, that while the principle might be clear as an abstract statement of law, "[l]ess clear are the means by which a defendant may [so] waive counsel." (*Id.* at 1263.) Specifically, the decision in *Faretta* "presupposed a cooperative defendant willing to engage in reciprocal dialogue with the court. The Supreme Court has never confronted a case in which an uncooperative defendant has refused to accept appointed counsel or engage in a colloquy with the court. Consequently, the Court has never been asked to determine whether a defendant may waive counsel without making an explicit, unqualified request to represent himself." (*Id.*)

The Eleventh Circuit, however, faced such a defendant. Garey's beef with the trial court was its refusal to appoint him new counsel, and, as a result, Garey would neither unequivocally waive counsel nor affirmatively agree to representation by his existing appointed counsel. While the decision in *Faretta* presumed an unequivocal waiver by a defendant of the right to counsel, the *Garey* court was forced to determine whether a defendant who refused to give an unequivocal waiver could be deemed to have effectively waived counsel, as the district court found when it permitted the defendant to represent

---

[1] *Faretta v. California,* 422 U.S. 806 (1975).

himself at trial.

The Eleventh Circuit upheld the district court's decision finding a waiver.  In upholding the district court's decision, the Eleventh Circuit, however, made clear that a district court likewise has broad discretion, particularly when a defendant engages in circular dialogue and equivocation, to decide that a defendant has <u>not</u> voluntarily waived his right to counsel and to then require counsel to continue representation of the defendant:

> In recognizing that a defendant may waive counsel by his uncooperative conduct as well as by his express request, we do not suggest that district courts are bound to interpret the uncooperative behavior of <u>*every*</u> defendant as a waiver of the right to counsel. Nor do we suggest a district court would err by requiring any particular defendant to make a clear statement of his intention to proceed pro se before agreeing to dismiss appointed counsel.  In any given case, the proper course of action will turn on factors the district court is best positioned to assess.  What we recognize today is that, in some instances, a defendant's conduct will reveal a voluntary decision to choose the path of self representation over the continued assistance of counsel.  In such cases, the district court may, in its discretion, conclude the defendant has voluntarily waived his right to counsel.

*Id.* at 1266 (emphasis in original).

Indeed, the court noted, a trial court must be assured that the defendant understands his choices, knows the dangers of self-representation, and intends to reject a lawyer.  (*Id.* at 1268.) Repeating its intention to allow the district court broad discretion in making a decision under such uncertain circumstances, the court

AO 72A
(Rev.8/82)

again noted:

> Once again, we emphasize a Court is not *required* to relieve
> a criminal defendant of counsel when the defendant engages
> in obstructionist conduct.  If, when viewing all relevant
> circumstances, a Court concludes a defendant's equivocal,
> irrational, or otherwise uncooperative conduct stems from
> serious mental illness, confusion, or <u>any other condition
> indicative of a lack of understanding</u>, the Court should
> prohibit the defendant from proceeding pro se, even if the
> defendant has rejected counsel or made an affirmative
> request to proceed without counsel.  *Cf. Indiana v. Edwards*
> (citation omitted)(Constitution permits judges to take
> realistic account of defendant's mental capacities by
> asking whether defendant who seeks to conduct his own
> defense at trial is mentally competent to do so). <u>Our
> decision today is meant</u> to provide trial courts with
> guidance and discretion—<u>not to force courts to discharge
> counsel against their better judgment</u>.

*Id.* at 1267, n.9 (*italics* emphasis in original) (<u>underlined</u> emphasis
added).

Given its lengthy colloquy with defendant Cartman set out above,
this Court denied defense counsel's motion to withdraw from the case
and directed him to continue representing the defendant at trial.
The undersigned did so for the following reasons.  First, as to
equivocation, the defendant's attitude toward representation by
counsel prior to the pretrial hearing before this Court had been
characterized by hints that defendant might not be enthusiastic about
the situation, followed ultimately by a decision that he would like
to have counsel represent him.  Indeed, the magistrate judge
conducted two hearings with the defendant, upon learning that the
defendant might not want his appointed counsel to continue

15

representing him.  In both hearings, the defendant indicated his frustration that his counsel would not file defendant's jurisdictional motions (of which an abundance had already been filed by the defendant), but on both occasions agreed that he wanted to continue with counsel.

In the hearing before this Court, defendant did not even make it past the Court's first question as to whether he wanted to represent himself.  Instead of answering "yes," which response one would have expected if defendant had really wanted this outcome, defendant stated that this would be an option, but only if the prosecution could provide him with a proper claim.  As the prosecution was never going to be able to articulate a claim that would satisfy the defendant, this scenario could never occur.  Shoring up the Court's sense of defendant's ambivalence about self-representation is the fact that he never indicated that there was any disagreement with his counsel on trial strategy, as is the typical situation when a defendant seeks to fire his appointed lawyer. Rather, as opposed to disagreeing with his counsel's approach to defending him factually on these charges, defendant refused to even talk to his attorney about the case.  Instead he focused on this Court's perceived lack of power to try him at all, regardless of whether or not the evidence showed him to have engaged in the charged conduct.

More significant, though, was the Court's concern that defendant

16

had failed to manifest a basic understanding of the proceedings necessary to allow the undersigned to conclude that any waiver by defendant would have been knowing, voluntary, and intelligent, had a waiver been clearly given. *See United States v. Kimball,* 291 F.3d 726, 730 (11th Cir. 2002). Two of the factors to be considered in judging whether a waiver is intelligent and knowing are: (1) the defendant's knowledge of the nature of the charges and possible defenses and penalties and (2) the defendant's understanding of the rules of evidence, procedure, and courtroom decorum. (*Id.*) Despite extensive questioning, defendant never manifested an understanding of any of these matters.

When questioned about his anticipated defense to the charges, defendant gave an answer that sounded delusional, as he spoke of the fact he did not need a defense because there was a "ghost over there" that he could not see and that he was "just trying to understand." *Supra* at 11. When asked about the elements of the offense, defendant went off on a tangent, suggesting that he would not have been in the United States when he allegedly possessed these firearms, but could have been in Afghanistan, Mexico, or Canada. *Supra* at 10-11. This latter comment apparently related to defendant's belief that firearms transactions in Atlanta, Georgia were not within United States jurisdiction because the Governor of Georgia had not ceded the land on which defendant was standing to the federal government, nor had

17

the prosecutor provided a "certificate of session for these locations." *Supra* at 10.  Defendant repeatedly stated that he did not understand the "cause and nature" of the charge or the "claim." *Supra* at 6-10.

As to defendant's understanding of the rules of evidence, procedure and courtroom decorum, any manifestation of such knowledge was non-existent.  It is true that a waiver can be knowing and intelligent, even if the defendant does not demonstrate any expertise in applying rules of evidence or procedure, nor does a defendant have to show himself to be an effective advocate.  It is enough that a defendant understands that "rules do exist to govern the procedure of a trial, the introduction of evidence and the behavior of advocates, and ... that he would be bound by those rules." *Kimball*, 291 F.3d at 731.

Yet, here, the defendant claimed not to even understand which rules or law applied, and he certainly never assured the undersigned that he would be bound by the applicable rules.  For example, he refused to acknowledge that the rules of criminal procedure applied, and instead repeatedly argued that Rules 1 and 2 of the civil procedure rules governed, as well as some 1938 common law, and the laws of equity and admiralty.  *Supra* at 9-10.  He also repeatedly

18

claimed not to understand which rules would be used at trial.[2] *Supra* at 8-10, 12. *Compare United States v. Price*, 485 Fed. App'x 3d 396, 398 (11th Cir. 2012) (defendant who asked to proceed pro se indicated that he intended to read federal rules); *United States v. Parker*, 277 Fed. App'x 952, 955 (11th Cir. 2008)(defendant was aware that rules existed and that he would be bound by rules).

It may well be that the above statements by defendant were a ruse and that he did, in fact, understand everything, but was simply enjoying the mischief and aggravation that he was causing.[3] Yet, the undersigned could not confidently make that assumption. The prosecutor had been so concerned about the ravings of the defendant in his pleadings that he requested that the defendant be examined to determine his competency: a motion that the magistrate judge granted.

---

[2]   As to courtroom protocol, defendant's understanding, or willingness to abide by this protocol, was lacking.  Indeed, at trial, he refused to stand at any time during the proceedings.

[3]  That was the conclusion of the district court, affirmed by the Eleventh Circuit, in *United States v. Talley*, 315 Fed. App'x 3d 134 (11th Cir. 2008)  There, the sovereign citizen criminal defendant, who later represented himself at trial, gave the *de rigeur* "long, rambling, and obscure" responses to questions. *(Id.* at 139.)  An examining psychologist concluded that the defendant's "nonsensical use of legal jargon" was a tactic designed to manipulate the proceedings. *(Id.* at 144.)   In contrast, here the examining psychologist did not impute manipulation to defendant Cartman, but characterized him as acting on bad legal advice.  Moreover, Talley at least had demonstrated adequate familiarity with procedural and evidentiary rules, and stated that he knew those rules would apply at his trial *(id.* at 144): acknowledgments never given in this case by defendant Cartman.

AO 72A
(Rev.8/82)

(Mot. for Psychiatric Exam [99]; Order [101].)

The examining psychologists determined that defendant was competent to stand trial. (Psychiatric Report [160].) They did note, however, defendant's representation that he had previously been diagnosed with bipolar disorder. (*Id.* at 5, 6.) As to the reasons why the defendant was pursuing his nonsensical legal defenses, the report indicated that defendant's "idiosyncratic defense strategy is a variation on one that has been widely distributed in recent years. It appears to be the result of potentially improper legal advice, not due to either mental illness or an attempt to feign mental illness." *(Id.* at 9.)

In *Indiana v. Edwards*, 554 U.S. 164 (2008), the Supreme Court concluded that it was appropriate for a state trial court, acting pursuant to state law, to require a criminal defendant who suffered from severe mental illness to be represented by counsel, even though the defendant had been deemed competent to stand trial. Defendant Cartman's claimed prior diagnosis of bipolar disorder was perhaps not as dramatic, or as documented, a mental disorder as the schizophrenia possessed by the defendant in *Edwards*. *Id.* at 168. Nevertheless, the possibility that defendant suffered from some mental illness, combined with all the circumstances discussed above, prompted this Court to conclude that he had failed to manifest the necessary understanding to proceed without counsel. Given the uncertainty of the defendant's

20

level of functioning, prudence suggested that it was best to err on the side of protecting defendant's rights, notwithstanding his best efforts to sabotage those rights. *See United States v. Posadas-Aguilera*, 336 Fed. App'x 970, 976 (11th Cir. 2009) ("we concur with brethren on the Seventh Circuit and read *Edwards* to hold that '[t]he Constitution *may*...allow [ ] the trial judge to block [a defendant's] request to go it alone, but it certainly [doesn't] require it.")(citations omitted).

    D.   <u>Trial</u>

The defendant initially manifested hostility at the beginning of the trial. He refused to wear civilian clothes, insisting on wearing his orange jail uniform. Further, he refused to stand when the undersigned entered or left the courtroom and would not directly answer questions. As the trial continued on, though, defendant became more cooperative. At the beginning of trial, the undersigned had told the defendant that he would be allowed to provide input as to the proceedings outside the presence of the jury, during breaks. (Tr. [217] at 26.) Defendant took advantage of that opportunity toward the end of the trial when the question arose as to the appropriateness of a jury instruction on the defendant's fugitive status prior to arrest. Specifically, defendant disputed the accuracy of the Government's position that he had not disclosed his location during the period of time before his arrest. The undersigned and the

defendant engaged in a lengthy colloquy concerning whether the defendant wished to testify to try to establish that he was not hiding. (Tr. [219] at 444-77.) Ultimately, the defendant decided that he would not testify and the Court decided, with the acquiescence of the Government, not to give a flight instruction. (*Id.* at 475-76.)

Around this same time, a question arose as to whether a juror with travel plans later in the week should be excused. The undersigned solicited defendant's position on this matter, which he provided. Defendant ultimately agreed with the prosecutor that the juror should not be excused. During this exchange, the defendant was cooperative. (*Id.* at 522-28.)

The jury deliberated and returned a verdict of guilty on all counts as to the defendant. [170].] Sentencing was set on a date approximately three months later, on August 20, 2012. ([171].)

## II.   **SENTENCING**

After the conclusion of the trial, but before the first scheduled sentencing date, the defendant files several motions challenging the verdict. ([175, 180-87]). In one of these pleadings [185], he filed a notice/demand to proceed *pro* se. Thereafter, defense counsel sent an email to the Court's deputy clerk, stating that the defendant refused to see counsel when the latter had attempted to visit him at USP-Atlanta to review the pre-sentence report ("PSR"). Counsel further reported that defendant refused the copy of the PSR that

22

counsel had mailed to him.  Counsel acknowledged defendant's request to proceed *pro se* and sought guidance from the Court. (Email [187-1].)

The Court issued an Order on August 9, referencing the email from defense counsel and indicating its willingness to allow defendant a role in representing himself at sentencing.[4]  (Order of Aug. 9, 2012 [(187).] The Order noted, however, that defendant would be unable to handle such a role if he refused to accept or to read his PSR. *(Id.* at 2.) It further explained, in detail, the sentencing process and the types of objections to the PSR on which the defendant should focus, the base offense level, the specific enhancements recommended in the PSR, the advisory guidelines range, and the parties' ability to ask the Court to vary from that range.  (*Id.* at 2-4.)

The Order indicated the Court's willingness to appoint defendant new counsel to assist at a sentencing hearing and to allow defendant to be heard on any sentencing issues, but advised that defendant would not be allowed to focus on irrelevant matters.  (*Id.* at 5.)  The Order directed defendant to respond by August 16 as to how he wished to proceed and as to whether he wanted additional time to file objections

---

[4]   As noted, at the end of the trial, the defendant had interacted in a coherent way with the Court on two matters. Defendant's conduct in this regard was in striking contrast with his bizarre and delusional rants at the pretrial hearing.  For this reason, as well as the fact that the Court intended to review de novo the entire record before determining what guidelines enhancements to apply, the undersigned ultimately acceded to defendant's request that he proceed without even stand-by counsel at sentencing.

to the PSR. *(Id.* at 6.)

Defendant submitted a seven-page response [188] on August 14, in which he spent most of his pages talking about the irrelevant jurisdictional matters on which he had fixated throughout the proceedings. In one paragraph, however, he did address obliquely the upcoming sentencing proceeding by indicating that he never received any documents from the probation office. (*Id.* at 6.) Defendant did not, however, disagree that he had refused the PSR offered to him by his attorney nor did he indicate whether he wished additional time to file objections.

In response to this pleading by defendant, the Court issued a second order [189] on August 15. It indicated that defendant would be allowed to represent himself at the sentencing hearing. Further, although defendant never requested a copy of the PSR that he had previously rejected, the Court directed the Clerk to mail another copy to the Warden at defendant's institution and directed the Warden to see that defendant got this copy. The Court set a new deadline of September 14 for the defendant to file objections and reset the sentencing date for October 9, 2012. (*Id.* at 4.)

On September 7, defendant filed another pleading indicating that he had not received a copy of the PSR. ([200].) The undersigned issued another Order [202] noting that the Postal Service indicated that the Warden had received the PSR and directing the Warden to

24

confirm this fact.  The Court issued an additional order [203] staying the deadline for objections pending confirmation of defendant's receipt of the PSR.

On September 18, the Court issued now a fifth order [204] concerning sentencing, in which it noted that the Bureau of Prisons had confirmed that defendant had received a copy of his PSR on September 18.  The Order noted that defendant's earlier Notice had requested his full 35-day period to object and that he had requested trial transcripts.  (*Id.* at 2-3.)  The Court indicated that it would have transcripts prepared for defendant's use and it continued indefinitely the sentencing date for that purpose.  (*Id.* at 3.)

The trial transcript was filed on November 26, 2012. ([217-219].] The Court issued an Order [221] on December 12, 2012, setting sentencing for February 13, 2013.  A sentencing hearing was held on that date.  Prior to that hearing, the undersigned read the entire trial transcript to ensure that any enhancements recommended in the PSR could be supported by the record.  While that proceeding has not yet been transcribed, the Court's recollection is as follows.

As to the twenty-three firearms for which the defendant had been held accountable, the Court concluded that even giving the benefit of the doubt to defendant as to four to five of those firearms, the number of guns for which defendant would be responsible would still fall within the eight-twenty-four firearms range.  Accordingly, the

25

Court imposed the recommended 4-level enhancement. The Court likewise imposed the 4-level enhancement for trafficking in firearms as that is clearly what defendant and his co-conspirator conspired to do, and did. The Court did, however, decide not to apply a 2-level enhancement for defendant's leadership role in the offense, even though the PSR had recommended this.

The original calculations in the PSR resulted in an Offense Level 30/Criminal History Category IV, for an advisory range of 135-168 months. With the Court's decision not to enhance the defendant for a leadership role, the modified range was then 28/IV, for a range of 110-137 months.

In its written submission, the Government had recommended a 168-month sentence. The Government had further noted that a Criminal History Category IV understated defendant's criminal history and dangerousness. Finally, the Government had argued that all the § 3553 factors tended to argue for a higher, not a lower, sentence of the defendant. *See* Gov.'s Letter of August 7, 2012, attached to PSR.

In articulating the basis for its sentence, the Court noted that there were aggravating factors that could justify an upward departure or variance. Specifically, defendant had three prior convictions involving weapons charges. Further, one of his co-conspirators had noted defendant's obsession with and love for guns, to the point that he even liked to sleep with them: a fixation that magnifies a concern

26

for the defendant's future dangerousness.  As to his conduct in the present case, the defendant had urged one of his co-conspirators to file a false police report.  He had refused to turn himself in and boasted to one-and-all on Facebook that he would not do so.  Perhaps, of most concern, was the hostility and anger that the defendant continued to demonstrate toward the legal system and the law. Defendant had accepted no responsibility for his offense and the absence of any awareness that it was his own conduct that had caused his problems, not the Court's failure to follow the UCC or admiralty rules, suggested that the prospects for defendant's future compliance with the law were quite poor.

Nevertheless, the Court declined to upwardly depart or vary, but instead determined that a sentence at the high end of the range, of 137 months, was a reasonable sentence under all the circumstances.

III. **DEFENDANT'S SPEEDY TRIAL MOTION**

Prior to certifying this case ready for trial on April 9, 2012, the magistrate judge issued a Report and Recommendation [136] ("R&R") recommending the denial of defendant's pending motion to dismiss based on the Speedy Trial Act [125].  The magistrate judge made very detailed calculations of the excludable time since the defendant's initial appearance in this district and concluded that, at most, only four days of time had elapsed under the Speedy Trial Act clock prior to April 9.  The Court concurs and adopts the magistrate judge's

27

Report and Recommendation ("R&R").

Assuming that defendant is continuing to contend that the Act was violated, the Court carries those calculations forward to the actual day of trial.[5]  As noted, the Report and Recommendation was issued on April 9, 2012.  According to the Order For Service of Report and Recommendation ([136](found behind theR&R)), the defendant had fourteen days to file objections to the R&R, which fourteen days would be excluded from the Speedy Trial Act.

On April 17, 2012, defendant filed a pleading titled "Authorized Representative's Conditional Acceptance and Conditions There Of Magistrates Order And Final Report" [139].  In this pleading the defendant indicated that, as the third-party intervenor, he conditionally accepted the magistrate judge's R&R, which sounds as ifthe defendant concurred with the magistrate judge's conclusions regarding the Speedy Trial Act.  Defendant's conditions to acceptance, however, were that the magistrate judge provide proof that, among other things, Anthony Vincent Cartman was the person who  actually entered a plea of not guilty; proof of a signed contract with Cartman; proof of territorial jurisdiction; and a variety of other similar demands for proof of matters not pertinent to a criminal proceeding.

---

[5]   The undersigned will not explain the legal basis for the exclusions following certification, but instead relies on, and incorporates, the magistrate judge's thorough recitation of the proper grounds for excluding time from Speedy Trial Act calculations.

28

As authority for these demands, defendant cited the UCC, the Federal Debt Collection Act (28 U.S.C. § 3002), and the Truth-in-Lending Act. *Id.*

As the magistrate judge did not meet defendant's demand nor his seventy-two hour time limit, the Court will assume that this pleading constitutes defendant's objection to the R&R.  That being so, the Court had thirty days from the Objection, or until May 9, 2012, to rule on the objections and determine whether to adopt the R&R.

Prior to that deadline, defendant filed another motion to dismiss indictment [145], on May 3, 2012, asserting a variety of grounds for that motion.  Under the Speedy Trial Act, the court had 30 days to rule on that motion, or until June 2, 2012.

This Court had previously, on March 22, 2012, set a trial date for May 21, 2013. With that date approaching, defense counsel filed a Motion to Withdraw As Counsel [149] on May 8, noting that while the defendant had never explicitly requested new counsel or to represent himself, he had refused all visits from counsel since his return from psychological testing, and had failed to respond to counsel's attempts to contact him by mail.  Under the Speedy Trial Act, the Court had 30 days to rule on that motion, but held a hearing the next day, on May 9, with the defendant present, and denied counsel's motion to withdraw.

Also, the Government having superseded the indictment on May 8,

AO 72A
(Rev.8/82)

the Court arraigned the defendant on the superseding indictment on May 9, and entered a plea of not guilty for the defendant when the latter refused to enter a plea.

On May 18, defendant filed yet another motion to dismiss, creating more excludable time to allow the court to rule, and, on May 20, the Government filed a motion in limine regarding the admission of Facebook chats by the defendant. These additional motions created further excludable time until June 19.

The trial began on May 21, 2012, prior to the expiration of some of the above excludable time. As no excludable time had elapsed since the magistrate judge's certification until the day of trial, the Court concludes that, at most, only 4 days had expired under the Speedy Trial Act clock. Therefore, any motion by defendant to dismiss based on a violation of this Act is **DENIED.** In addition, all of defendant's pending *pro se* motions ([164, 175, 180, 181, 182, 183, 184, 210, 212, 216, 222, 236, 237, 238, and 242]) are **DENIED**. Defense counsel's previous motion to withdraw [149] was denied at the pretrial conference on May 9, 2012.

30

SO ORDERED this 5th day of JUNE, 2013.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF U.S. DISTRICT JUDGE

31